In the matter of admitting to probate a paper purporting to be the last will and testament of BENJAMIN MIDDLETON, deceased.

[Filed November 22d, 1904.]

The mere fact that a testator made his mistress the chief beneficiary of his will raises no presumption that she had secured an influence over him, which she would naturally improperly exert to advance her own interest.

---

On appeal from the Cumberland orphans court.

*Mr. Samuel K. Robbins* and *Mr. Louis H. Miller,* for the appellants.

*Mr. Martin W. Lane* and *Mr. James S. Ware,* for the proponents.

BERGEN, VICE-ORDINARY.

This appeal requires the consideration of the decree of the orphans court of the county of Cumberland, admitting to probate the last will and testament of Benjamin Middleton, deceased.

The testator died on the 7th day of January, 1904, leaving a last will and testament, and surviving him, as next of kin, as appears in the petition for probate, a widow, Ellie J. Middleton, residing in Philadelphia; Louis Middleton, a brother, residing in Tioga, Pennsylvania, and Bushrod Hotteck, a nephew, residing in the city of Philadelphia. The will bears date the 6th day of January, 1904, and after providing for the payment of his debts, funeral expenses and place of burial, and the erection of suitable tombstones at his grave, disposed of his estate as follows: To Benjamin, the son of John Lahner, the sum of $500, when he arrives at age; to his wife, Ellie, his parlor furniture, piano, sewing machine and whatever she might be entitled to for dower in his estate, with the recital that she had deserted his home on the 4th day of October, 1890; to his brother, Louis, his watch, chain, diamond stud, Masonic emblems and all family pictures; to Minnie Watson Gilbert, substantially all of his housefurnishings, by a somewhat particular description, together with his undivided one-half interest in the stock and fixtures of a millinery business then carried on by himself and Minnie Watson Gilbert as partners, and also the sum of $300 to pay her for taking care of his dog "Trix" during its life; to the said Minnie Watson Gilbert, the residue of his estate. Minnie W. Gilbert and the Cumberland Trust Company were appointed executors, with power to sell his real estate.

The widow filed a caveat against the probate of the will, and on the hearing it was contended, in support of the caveat—*first,* that the testator was of unsound mind when the will was executed; and *second,* that he was unduly influenced by Mrs. Gilbert in the making of his will. The evidence shows that the first objection has no foundation. The testator undoubtedly was an excessive drinker of intoxicants during the last ten or fifteen years of his life, with the exception of about three months before

his death, when the testimony shows that he practically abstained, and there is nothing in the evidence which shows that when this will was executed his mind was not what is usually called sound and disposing. All the written memoranda given to the attorney who drew the will were prepared by the testator by erasures and interlineations of a previous will, indicating the changes he desired made, so far as he could do so, and to this were added oral instructions as to the disposition of certain property not in existence when the former will was executed. The care and method exercised in doing this, and the testimony of the witnesses as to his mental capacity, convince me that the first objection has not been sustained.

The material facts upon which it is sought to sustain the charge of undue influence are as follows: In 1890 the appellant left the home of her husband, and has never since resided with him. They were married in the year 1870 and resided in Philadelphia for about twelve years thereafter, when they removed to a farm near Moorestown, in the hope, as the appellant testifies, that he would reform, he being at that time an excessive drinker; but, according to her statement, this hope was not realized, for although he continued to attend to his business he was habitually drunk and cruel to her, for which reason she left him, but after staying away three or four months returned. The date of the first separation does not appear, but I gather from the testimony that it was in the year 1886, and she returned because her husband constantly wrote to her, insisting on her coming back. The reasons she gives for leaving him finally, in 1890, appear in the testimony as follows:

"*Q.* What was the cause of your leaving him the last time?
"*A.* Cruel treatment. I couldn't stand him.
"*Q.* You made up your mind to leave?
"*A.* I had to leave.
"*Q.* That was quitting, wasn't it?
"*A.* Yes; I was afraid of my life; a man who would run around the house and put up a pistol.
"*Q.* Then you made up your mind to quit him as long as he acted the way he was acting?
"*A.* Yes; that was right."

So far as the evidence in this case shows, the reason given by the wife for deserting her husband was his drunkenness and cruel treatment of her.

After his wife left him the testator met Mrs. Gilbert at Atlantic City, and I feel justified in finding that shortly after their meeting she began living with him as his mistress; from Atlantic City she went with him to the farm, and occupied nominally the position of housekeeper, and about six years previous to his death they removed to Millville, Cumberland county, and there entered into a millinery business as partners, which partnership continued until his death.

The husband, about two years after his wife left him, filed a bill against her for a divorce on the ground of desertion. She defended upon the ground of extreme cruelty, and by cross-bill asked and obtained a decree of divorce from bed and board, with a provision for her support and maintenance. There is not a particle of evidence in the cause, with perhaps a single exception, to which I shall hereafter refer, which shows any act or solicitation on the part of Mrs. Gilbert which might be interpreted as an attempt to unduly influence this testator to make her the object of his bounty, and we are asked to infer that because she was living with the testator as his mistress she had thereby secured an influence over him, which she would naturally improperly exert to advance her interest. Such an inference should not be drawn from this relationship without proof that Mrs. Gilbert "exerted her influence directly in the procuration of the will." *Arnault* v. *Arnault, 52 N. J. Eq. (7 Dick.) 801.* The probabilities are all in favor of the theory that this will expresses the purpose and intention of the testator. His wife had deserted him for no other reason than his dissolute habits; she had compelled him to pay for her support while living in a state of separation, and the present object of his bounty took her place. She did not displace her, because the wife had left her husband before Mr. Middleton had met Mrs. Gilbert, who stood by the deserted husband until his death, watching over him, caring for him, assisting in the conduct of his business, and remained faithful to him until his eyes were closed in death.

Two or three previous wills of this testator were offered in

evidence, one dated October 10th, 1893, in which he provided for the payment of certain notes held against him by Mrs. Gilbert for money loaned. He gave his wife her dower in his real estate, and to Mrs. Gilbert his household furniture, and other things about the farm, and also the farm itself. There is not the slightest evidence that Middleton was unduly influenced in the making of this will, beyond that to be inferred from his relations with Mrs. Gilbert. The next will bears date February 19th, 1903. In this will he provides for $500 to go to Benjamin, the son of John Lahner; $500 to a charitable society in Philadelphia; $500 to the Bedford Street Mission of Philadelphia, and the interest of $500 to another beneficial society in Philadelphia; directs that $500 be paid to Mrs. Gilbert to take care of his horse "Sam" and his dog "Trix;" to his wife, Ellie, substantially same furniture as is given by the will probated, and in the same manner to Mrs. Gilbert the household goods, as described in the last will; to his brother, Louis, $300, family pictures and Masonic emblems; to Mrs. Gilbert $1,000; to his brother, Louis, and Mrs. Gilbert, the residue of his estate. It was this instrument that the testator used, by erasing and interlining, to accomplish the changes he desired in preparing the statement or directions from which the last will was prepared.

The next will bears date January 5th, 1904, and is precisely like the will probated with the exception that one of the executors, viz., the Burlington County Safe Deposit and Trust Company, was changed to the Cumberland Trust Company. It thus appears that from 1893 to the very day of his death this testator had constantly in mind the purpose of making a provision for Mrs. Gilbert. The evidence shows that his estate has been considerably reduced between 1893 and the making of the last will. He had been compelled to mortgage his farm for $5,000 to pay the alimony adjudged to his wife as well as other debts, and while the amount of the estate has not been made to appear in this cause, enough is shown to warrant the conclusion that it is very small. It was testified to that the testator said that his brother, Louis, was omitted as a residuary legatee in the last will because he had talked the matter over with him and told him what he intended to do, as the brother had plenty. The

brother was sworn and testified that in October previous to his brother's death he had a conversation with his brother, the material part of which appears in the testimony as follows:

"*Q.* Did you ask him on any of these occasions to leave you his Masonic emblems?

"*A.* Yes, sir.

"*Q.* That is right, is it?

"*A.* That was up in the office.

"*Q.* How long before?

"*A.* October, the year before.

"*Q.* The October before?

"*A.* Yes, sir.

"*Q.* Did you tell him that was *all you wanted?*

"*A.* I asked him about that diamond pin.

"*Q.* Was that a Masonic emblem?

"*A.* No; just a diamond pin; he says, 'All right, if you want it you can have it, but,' he says, 'I intended to give that to Mrs. Gilbert.'"

I am satisfied from all of the evidence in the cause, from the conversation which the testator had with his brother with reference to the disposition of his property, and from the constant and unchanging purpose to provide for Mrs. Gilbert, manifested by the contents of these different wills, that Mrs. Gilbert did not unduly influence the testator, and that the will admitted to probate contains his desires as to the disposition of his property, free from any unlawful bias.

So much stress was laid by the appellant, at the argument, upon the testimony of Susana Roun, as disclosing undue influence, that it is only fair I should refer to it. She claims to have been at Mr. Middleton's house just after the time the will of January 5th, 1904, was executed, and testified that Mrs. Gilbert said to her that Benjamin had made his will; that he had "made it to that thing, and herself, the balance what was left;" that she was listening at the door when the lawyer was up there, and that when he came out she said to him "that won't stand law," and that the lawyer told her to be still. I am not disposed to credit this testimony. The many contradictions and inconsistencies appearing in the testimony of this witness entitles her to very little credit. The lawyer was permitted, without objection, to testify that no such thing occurred. Mrs. Gilbert denies making any such statement, and it is extremely improb-

able that Mrs. Gilbert, if she had procured the making of a will which was not the uninfluenced will of the testator, would have told the witness that it would not "stand law." But assuming that Mrs. Gilbert said exactly what she is charged with having said, taken in connection with what the witness next testified to, viz., that the will did not suit Mrs. Gilbert, and that she was so incensed that she turned over the care of the testator to the witness, it would not prove that she had unduly influenced the testator to do what she wanted done; but, on the contrary, that the influence which she had undertaken to exert had been unavailing, and that the testator had acted contrary to her wishes.

The decree of the orphans court admitting this will to probate should be sustained.